

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

---

*The Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

May 1, 2026

**BY ECF**
The Honorable Dale E. Ho
United States District Judge
Southern District of New York
40 Foley Square
New York, New York 10007

     Re:    ***United States v. Michael Gann*, 25 Cr. 331 (DEH)**

Dear Judge Ho:

The Government respectfully submits this letter in advance of the May 8, 2026 sentencing of defendant Michael Gann in the above-captioned case.

The defendant constructed at least seven improvised explosive devices (the "IEDs"), using precursor chemicals that he had ordered on the internet and transported into Manhattan from Long Island. After constructing them, he stored five of those IEDs, four shotgun shells, and the remaining precursor chemicals on the rooftops of abutting residential apartment buildings in the SoHo neighborhood of Manhattan, while he threw another of the IEDs onto subway tracks on the Williamsburg Bridge and was arrested on the street in SoHo in possession of a final IED. After he was arrested, he lied to law enforcement officers and falsely claimed that he had disposed of the precursor chemicals and the shotgun shells in a dumpster, and that he possessed no remaining IEDs, when he had in fact stashed those items on the SoHo rooftops where he had been residing. This was exceedingly dangerous conduct that readily could have resulted in the destruction of property, serious injury, or even death. The defendant, even now, fails to take full responsibility for this conduct, falsely claiming that he meant no harm and intended only to build homemade fireworks—claims belied by the evidence in this case. Furthermore, all of this comes after decades of criminal activity by the defendant, including more than 30 criminal convictions dating back to 1987.

Accordingly, and for the reasons set forth below, the Government respectfully submits that a sentence within the applicable United States Sentencing Guidelines ("U.S.S.G." or the "Guidelines") range of 37 to 46 months' imprisonment would be sufficient, but not greater than necessary, to serve the legitimate purposes of sentencing in this case.

## I.      Background

### A.      Offense Conduct

In the spring and early summer of 2025, the defendant researched firearms and bomb-making materials and posted online and spoke about his animus toward certain minority groups and intent to cause harm to others.

For example, in the weeks leading up to his arrest, in May and June 2025, the defendant conducted internet searches that included: "will i pass a background check," "gun background check test," "can i buy a gun in any state without ffl [federal firearms license]," "3D gun printing," "gun stores," "clorine bomb," "how to make flash powder from household items," "what to mix with potassium perchlorate to make flash powder," "alluminum powder," "black powder nearby," "firework chemical equation," "pyro supplies," "quarter stick m1000 firecracker," "block buster firework," "1/2 stick dynamite," "glue sticks for glue gun," and "rechargeable nail gun to shoot into steal." (Final Presentence Investigation Report dated April 23, 2026 ("PSR") ¶ 9).[1]

Additionally, in March 2025, the defendant posted the following message on X and tagged @POTUS, the official X account for the President of the United States: "Dear @POTUS, I'm thinking just now here in NYC that it's too bad that the wall wasn't built before the National Guard would have to come here for the Protests and Riotation or would you just drop a bomb on this place while and because they seem to be coming and coming?" (Id. ¶ 8).

The defendant's efforts to obtain a weapon and his hate-filled rhetoric were not limited to online searches and social media postings. On May 30, 2025, the defendant placed an online order for approximately two pounds of potassium perchlorate—a precursor chemical, i.e., a chemical that can be combined with others to create an explosive mixture—over 200 cardboard tubes, and over 50 feet of fuses. (Id. ¶ 10). The defendant separately placed an online order for approximately one pound of aluminum powder—another precursor chemical, which, when mixed with potassium perchlorate, creates an explosive—all to be delivered to the residence of a friend ("Witness-1") in Nassau County (the "Nassau Residence"). (Id.)

On June 4, 2025, the defendant visited the Nassau Residence to retrieve his orders containing the precursor chemicals and other materials. (Id. ¶ 11). While there, in the garage of the Nassau Residence, the defendant mixed a teaspoon-sized amount of the potassium perchlorate and aluminum powder and applied a flame, causing an explosion. (Id. ¶ 12). Witness-1 then did the same, causing a second explosion. (Id.).[2] After another individual ("Witness-2"), who also

---

[1] The defendant's internet searches in May and June 2025 also included "P80 ghost gun kit," "hellcat gun," "hellcat 9mm," and "micro compact hellcat 9mm."

[2] In his submission, the defendant claims that Witness-1 now reports that only Witness-1, not the defendant, ignited a mixture of the precursor chemicals at the Nassau Residence. (Def. Br. at 3; PSR ¶ 12). During an interview with law enforcement on June 5, 2025, however, Witness-1

lived at the Nassau Residence and is a United States military veteran, observed the second explosion and confronted the defendant, the defendant responded, in substance and in part, "What kind of veteran are you?  You see a problem going on in the neighborhood and you do nothing about it."  (*Id.* ¶ 13).  The defendant then pointed to a Jewish school located behind the Nassau Residence.  (*Id.*).[3]  The defendant also, while at the Nassau Residence, discussed gluing ball bearings to the exterior of devices consisting of the cardboard tubes he had ordered, filled with a potassium perchlorate and aluminum powder mixture.  (*Id.* ¶ 14).[4]  The defendant left the Nassau Residence a short time later, carrying the mixed and unmixed precursor chemicals, the cardboard tubes, the fuses, and at least two shotgun shell casings.  (*Id.*)

On June 5, 2025, after law enforcement was made aware of what had transpired the day prior at the Nassau Residence, officers began an intensive search for the defendant.  Later that evening, law enforcement observed the defendant walking down a street in SoHo carrying a shoulder bag and placed him under arrest.  (*Id.* ¶¶ 17-18).  Inside the shoulder bag, law enforcement found binoculars, a pocketknife, a lighter, additional tools, and an IED consisting of a cardboard tube filled with explosive material and equipped with a fuse on one end.  (*Id.* ¶ 18).  Prior to his arrest, after the arresting law enforcement officers had identified themselves, the defendant spontaneously uttered that he was purportedly on his way to the fire department to "drop it [*i.e.*, the IED] off."  (*Id.* ¶ 17).

Following his arrest, during a *Mirandized* post-arrest interview, the defendant falsely claimed, among other things, that he had built a total of four devices, three of which he had thrown from the Williamsburg Bridge and one of which he had on his person when arrested; and that he had previously taken four shotgun shells from a friend's boiler room, but that he had disposed of the shotgun shells, as well as the remaining potassium perchlorate and aluminum powder, in a dumpster in Manhattan.  (*Id.* ¶ 19).  Law enforcement conducted a search of the Williamsburg Bridge and recovered a second IED, consistent in appearance with the first, from the train tracks that run down the center of the bridge.  (*Id.* ¶ 20).

After having been informed that the defendant, who was otherwise unhoused, often resided on apartment building rooftops, law enforcement also searched the rooftops (the "Rooftops") in the vicinity of where the defendant was arrested and discovered a collection of the defendant's possessions.  (*Id.* ¶ 22).  Among those items, law enforcement recovered—contrary to the defendant's statements during his post-arrest interview—five additional IEDS, one of which contained approximately 30 grams of explosive powder, which is approximately 600 times the legal limit for consumer fireworks; the remaining precursor chemicals; and four shotgun shells.

---

reported that the defendant first ignited a mixture of the precursor chemicals, and then, after that, Witness-1 also ignited a mixture.

[3] The defendant also stated during this confrontation, in substance and in part, "they're taking over the neighborhoods," and, at a different point during the argument, "if nobody is going to do anything about it, then I will."

[4] According to Witness-1, Witness-1 subsequently convinced the defendant not to carry through with his plan to attach ball bearings to the devices.

(*Id.*). An excerpt from an FBI laboratory report analyzing the IEDs, which includes photographs of one of the IEDs after it had been disassembled by the FBI, is below:



Figure 3. IED #2 container and hobby fuse as received by FBI Laboratory.

Figure 4. IED #2 top view.

(Def. Br. Ex. A at 5).

### B.      Procedural History

On June 6, 2025, the defendant was charged by criminal complaint with (i) unlawful manufacture of a destructive device, in violation of 26 U.S.C §§ 5822, 5861(f), and 5871, and 18 U.S.C. § 2; (ii) unlawful possession of a destructive device, in violation of 26 U.S.C. § 5861(d); and (iii) transportation of explosive materials, in violation of 18 U.S.C. § 842(a). (Dkt. 1).

On July 22, 2025, a grand jury in this District returned a three-count indictment charging the defendant with (i) attempted destruction of property by means of explosives, in violation of 18 U.S.C. § 844(i); (ii) transportation of explosive materials, in violation of 18 U.S.C. §§ 842(a)(3)(A) and 844(a); and (iii) unlawful possession of destructive devices, in violation of 26 U.S.C. 5861(d) and 5871. (Dkt. 8).

On January 16, 2026, the defendant waived indictment and pleaded guilty, pursuant to a plea agreement (the "Plea Agreement"), to a superseding information charging him with (i) possession of ammunition after a felony conviction, in violation of 18 U.S.C. 922(g)(1) ("Count One"); and (ii) transportation of explosive materials, in violation of 18 U.S.C. §§ 842(a)(3)(A) and 844(a) ("Count Two"). (Dkt. 19).

### C.      Plea Agreement, Guidelines Calculation, and PSR

In the Plea Agreement, the parties stipulated that, based on an offense level of 21 and a Criminal History Category of I, the defendant's applicable Guidelines range is 37 to 46 months' imprisonment. The parties calculated the defendant's offense level by applying a base offense level for Count One of 20 because the offense involved a firearm described in 26 U.S.C. § 5845(a), and the defendant was a prohibited person at the time he committed the instant offense; a two-level increase because the offense involved three to seven firearms, namely, the four shotgun shells

and five IEDs recovered from the Rooftops[5]; a two-level increase because the offense involved a destructive device other than as referenced in § 2K2.1(b)(3)(A); and a three-level reduction for acceptance of responsibility.[6] The parties calculated the defendant's Criminal History Category based on an understanding that, due to the passage of time, none of the defendant's three prior felony convictions and 28 prior misdemeanor convictions result in any criminal history points.

In the PSR, Probation concurs with the parties' computation of the applicable Guidelines range (PSR ¶¶ 28-76, 111) and recommends a downward variance of 24 months' imprisonment (*Id.* at 34). Probation cites, as aggravating factors, the significant danger to the public posed by the defendant's actions, noting that the IEDs "created a grave risk of injury, particularly in a busy neighborhood like SoHo in Manhattan"; and the defendant's extensive criminal history dating back to 1987, which includes convictions for weapons possession, property crimes, menacing, assault, resisting arrest, trespassing, harassment, and possessing burglary tools. (*Id.* at 35). Probation also cites mitigating factors, namely, the defendant's "lack of social support and significant mental health history," and states that it "cannot discount . . . the role it likely played in [the defendant's] criminal behavior." (*Id.*).

## II.    **Applicable Law**

The Guidelines still provide important guidance to the Court following *United States v. Booker*, 543 U.S. 220 (2005), and *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005). Indeed, although *Booker* held that the Guidelines are no longer mandatory, it also held that they remain in place and that district courts must "consult" the Guidelines and "take them into account" when sentencing. *Booker*, 543 U.S. at 264. As the Supreme Court stated, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," which "should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007).

After that calculation, a sentencing judge must consider seven factors outlined in 18 U.S.C. § 3553(a): (1) "the nature and circumstances of the offense and the history and characteristics of the defendant"; (2) the four legitimate purposes of sentencing, as set forth below; (3) "the kinds of sentences available"; (4) the Guidelines range itself; (5) any pertinent policy statement by the Sentencing Commission; (6) "the need to avoid unwarranted sentence disparities among defendants"; and (7) "the need to provide restitution to any victims." 18 U.S.C. § 3553(a)(1)-(7); *see also Gall*, 552 U.S. at 49-50 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

---

[5] The parties stipulated in the Plea Agreement that these shotgun shells and IEDs constituted "parts designed or intended for use in converting any devices into destructive devices, and from which destructive devices may be readily assembled." (Plea Agreement ¶ A(4)).

[6] The parties agreed that Count Two results in a lower offense level than Count One and, after the grouping analysis under the Guidelines, does not impact the final offense level.

(A)     to reflect the seriousness of the offense, to promote respect for the law, and
        to provide just punishment for the offense;

(B)     to afford adequate deterrence to criminal conduct;

(C)     to protect the public from further crimes of the defendant; and

(D)     to provide the defendant with needed educational or vocational training,
        medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

"[I]n the ordinary case, the [U.S. Sentencing] Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'" *Kimbrough v. United States*, 552 U.S. 85, 109 (2007) (quoting *Rita v. United States*, 551 U.S. 338, 350 (2007)); *see also United States v. Bryant*, 976 F.3d 165, 181 (2d Cir. 2020) ("In the overwhelming majority of cases, a Guidelines sentence will fall comfortably within the broad range of sentences that would be reasonable in the particular circumstances." (quoting *United States v. Fernandez*, 443 F.3d 19, 27 (2d Cir. 2006))).

## III.     Discussion

The Government respectfully submits that a sentence within the applicable Guidelines range of 37 to 46 months' imprisonment would appropriately take into account the sentencing factors set forth in Section 3553(a), including the nature and circumstances of the offense; the history and characteristics of the defendant; and the need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate deterrence, and protect the public.

### A.     A Guidelines Sentence is Warranted in this Case

The defendant's conduct was exceedingly serious and dangerous.  *See* 18 U.S.C. §§ 3553(a)(1), (2)(A).  The defendant assembled at least seven IEDs that contained an explosive mixture of precursor chemicals; possessed four shotgun shells and discussed attaching ball bearings to the exteriors of the IEDs; threw one IED onto train tracks on the Williamsburg Bridge; and had yet another device on his person at the time he was arrested, walking down the street in the crowded SoHo neighborhood in Manhattan.  Then, following his arrest, the defendant lied to law enforcement about his conduct and about the status of the remaining explosive devices and materials, claiming that he had disposed of those items in a dumpster and the East River when they were in fact sitting atop a residential apartment building.

But for law enforcement's apprehension of the defendant and subsequent discovery of his stash of additional explosive materials and IEDs—one of which contained approximately 600 times the legal limit for consumer fireworks—this conduct could have resulted in tragic consequences.  This concern is underscored by the defendant's own words and actions before his arrest.  As noted above, before he was arrested, the defendant had a series of online postings and

searches evidencing his intent to obtain a weapon and his animosity towards particular individuals and groups. And, chillingly, just hours before he was arrested with one of the IEDs on his person, the defendant posted to Instagram: "Who wants me to go out to play like no tomorrow?" (*Id.* ¶ 21). It is clear that the defendant's conduct could have resulted in injury, death, or damage to property, and a serious sentence is necessary to reflect the seriousness of this conduct.

Moreover, this is far from the first time that the defendant has engaged in criminal conduct, and the sentence imposed should also reflect the need to deter the defendant and others similarly situated from such conduct in the future. *See* 18 U.S.C. § 3553(a)(2)(B). Indeed, the defendant has a decades-long criminal history, which includes more than 30 prior convictions dating back to 1987. Plainly, the defendant's prior sentences failed to deter the defendant from continuing to engage in criminal conduct. Thus, a serious sentence in this case is required to demonstrate to the defendant that his conduct—and, in particular, his conduct in manufacturing devices that could have injured or worse—will not be tolerated, and to protect the public from future crimes by the defendant. *See* 18 U.S.C. § 3553(a)(2)(C).

Similarly, there is a need for the sentence imposed to provide for general deterrence, which also weighs in favor of a sentence within the Guidelines Range. *See* 18 U.S.C. § 3553(a)(2)(B). As this case illustrates, obtaining explosive precursor chemicals and the means to inflict terrible harm is not terribly difficult, and a message must be sent to individuals, like the defendant, who harbor dangerous animus toward others, that attempting to engage in conduct like that at issue here will result in serious consequences.

## B.    The Defendant's Submission

The Government acknowledges that there are also mitigating factors present in this case, as noted by Probation; namely, the defendant's history of mental health issues and his lack of social support. (PSR at 35). But those factors, while valid, must be balanced against the seriousness of the defendant's conduct; his history and characteristics, including his prior criminal conduct; and the needs for punishment, general deterrence, and specific deterrence.

Furthermore, in his sentencing submission, the defendant fails to meaningfully take responsibility for his conduct, instead claiming that he never meant to hurt anyone and only intended to make firecrackers in anticipation of July 4th. (Def. Br. at 2-6). This claim is belied by the evidence in this case and, if anything, militates in favor of a more severe sentence.

*First*, the defendant argues that in the lead-up to his arrest, he conducted numerous internet searches related to fireworks. (Def. Br. at 2-4). That is true. But the defendant omits the host of other internet searches he conducted that related not to fireworks, but rather to firearms and bombs. His searches included, for example, "will i pass a background check," "gun background check test," "can i buy a gun in any state without ffl [federal firearms license]," "3D gun printing," "gun stores," and "clorine bomb." (PSR ¶ 9). None of those searches related to the mere creation of recreational fireworks.

*Second*, the IEDs that the defendant created went far beyond typical homemade fireworks. As noted above, one of the IEDs recovered from the Rooftops contained approximately *600* times

the legal limit for consumer fireworks.  And, as noted above, the defendant discussed gluing ball bearings (like the pellets contained within the shotgun shells he possessed) to the exteriors of the devices—and conducted an internet search for "rechargeable nail gun to shoot into steal"—which, again, is not consistent with the creation of mere homemade fireworks.  Indeed, as noted in the FBI laboratory report analyzing the IEDs, had the defendant gone through with combining the shotgun shells to the IEDs, the shotgun shells' casings "would serve as hardened fragmentation and enhance the IED's lethality and destructive capability."  (Def. Br. Ex. A at 3).  While law enforcement stopped the defendant before he could fully complete what he had plainly been contemplating, his intent—evidenced by his statements, his internet searches, and the items he possessed at arrest—deserves significant consideration in the context of his sentencing arguments and in fashioning the appropriate sentence in this case.

*Third*, the defendant threw one of his IEDs onto train tracks on the Williamsburg Bridge, an action that plainly could have caused extreme harm to others and is wholly inconsistent with the defendant's claims that he was solely seeking to make fireworks in advance of July 4th.  The defendant argues in his submission, as he has asserted before, that he attempted to throw the IED from the pedestrian walkway on the Williamsburg Bridge, but that it "did not make it to the water" and accidentally landed on the train tracks.  (Def. Br. at 4).  That is not credible.  As shown in the publicly available image of the Williamsburg Bridge provided below, the layout of the Williamsburg Bridge is such that the train tracks run down the center of the bridge, with the two pedestrian walkways on either side.  In other words, from each pedestrian walkway, the water and the train tracks are in opposite directions.



Accordingly, it is not plausible that had the defendant attempted to throw the device in the direction of the water, it would have instead landed on the train tracks as it did.  Rather, it is apparent that the defendant threw the device onto the train tracks *intentionally*—which, again, cannot be squared with his purported intention only to create fireworks in advance of July 4th.

*Fourth*, after having thrown one of the devices onto the train tracks, the defendant returned home, then left once more with yet another device, along with binoculars, a pocketknife, and a lighter.  And he did so after having not only made worrisome comments about a Jewish school the

day prior, and after additional worrisome social media posts in the months and years prior, but also after posting just hours earlier: "Who wants me to go out to play like no tomorrow?"[7]  These are the words and actions of someone seeking to cause harm, not someone merely planning to make homemade fireworks to set off in celebration.

*Fifth*, after being arrested, the defendant lied about the status of his remaining IEDs, the shotgun shells, and the explosive precursor chemicals.  Specifically, he claimed that he had thrown the remaining IEDs off the Williamsburg Bridge and disposed of the shotgun shells and precursor chemicals in a dumpster, while he knew full-well that those items—which posed an extreme risk to the public—were stored on the Rooftops.  This, too, evidences his intent: knowing that he had amassed dangerous materials, he attempted to lie to law enforcement in an effort to evade further criminal exposure.  Had he merely been planning to make fireworks, the defendant assuredly would have told the police the same.[8]

## IV.     Conclusion

For the reasons set forth above, the Government respectfully requests that the Court impose a sentence within the applicable Guidelines range of 37 to 46 months' imprisonment.

Respectfully submitted,

JAY CLAYTON
United States Attorney for the
Southern District of New York

By:     _____/s/_____

Jonathan L. Bodansky
Michael D. Lockard
Chelsea L. Scism
Assistant United States Attorneys
(212) 637-2385 / -2193 / -2105

cc:    Martin S. Cohen, Esq.

---

[7] The defendant argues that this social media post is similar to prior posts, in which he had also referenced "[c]om[ing] out to play."  (Def. Br. at 6).  Those posts, however, are materially different, in that they omit anything analogous to the worrisome reference to "like no tomorrow."

[8] Similarly, as noted above, just prior to his arrest but after law enforcement had identified themselves, the defendant claimed that he was on his way to the fire department to turn in the IED on his person.  (PSR ¶ 17).  That claim, however, is wholly inconsistent with the fact that the defendant meanwhile left five more devices on the Rooftops and then lied to law enforcement about those remaining devices.